UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

BRIAN CUMMINGS,
PLAINTIFF

VS.

COMMISSIONER OF
SOCIAL SECURITY,
DEFENDANT

CASE NO. 1:09-cv-00602
(DLOTT, C. J.)
(HOGAN, M.. J.)

### REPORT AND RECOMMENDATION

Plaintiff filed his application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) in February, 2004. His application was denied both initially and upon reconsideration. Plaintiff then requested and obtained two hearings before an Administrative Law Judge (ALJ) in November and December at Dayton, Ohio. Plaintiff, who was represented by counsel, testified, as did Vocational Expert (VE) Mark Pinti. Also testifying was Medical Expert (ME), Dr. Richard Hutson, an orthopaedic surgeon, who conducted a paper review of Plaintiff's medical file. The ALJ reached an unfavorable decision in May, 2007. Plaintiff processed an appeal to the Appeals Council, which denied review in June, 2009. Plaintiff then filed his Complaint seeking judicial review in August, 2009.

### STATEMENTS OF ERROR

Plaintiff asserts four Statements of Error, the first of which is the failure to find a closed period of disability from October, 2003, the claimed onset date, until October, 2006. The second is the failure to follow the opinions of treating physicians, Stephen Pledger, M.D. and Dennis Anthony, M.D. The third faults the ALJ for not giving more credibility to Plaintiff's subjective reports of pain. The fourth faults the ALJ for concluding that Plaintiff was able to perform work other than his past relevant work.

## PLAINTIFF'S TESTIMONY AT THE HEARING

Plaintiff testified that he was 39 years of age, right-handed, 5'8" tall and weighs 145 lbs. Plaintiff testified that he was married and lived with his wife and son in Middletown, Ohio. He attended school through the 11th grade, but never obtained a GED. His last employment was at Durham's Sports in October, 2003. He stopped working after an incident at home where he injured his back lifting gravel.

Plaintiff told the ALJ that he has "severe lower back pain that goes down through my buttocks and both my legs . . . I have a ruptured disk in my neck also" [which] "makes my fingers numb on my left hand and radiates through my shoulders." He told the ALJ that he had previous back surgery in 2004, which allowed him to stand straight and relieved the burning sensation, but not the aching and stabbing pain. He implied that the cause of his back problem was an accident and that the delay in treating it surgically caused nerve damage. He has completed a course of physical therapy, but has had no epidural injections because of a fear of needles. Plaintiff testified that he agreed with Dr. Anthony that he is doing much better.

Plaintiff also testified that he has "some emotional problems," which he described as depression over his financial status and his marital relationship because his wife has to work and their "sex life" is not what it used to be. He also said he suffers from panic attacks several times per month, the stimulus for which is also his economic status. Dr. Anthony, his primary care physician, who he sees on a monthly basis, prescribes medication for depression, the effect of which is to cause some short term memory loss. Plaintiff rated his back pain as "7 to 10" in intensity and his neck pain as a "4 to 6."

Plaintiff estimated that he could walk for 1/4 mile, stand for 10-15 minutes and sit for 10-15 minutes. He estimated that he could lift 5-10 lbs. He indicated that a return to Dunham Sports, where his job was stocking inventory, would be impossible because of the lifting requirement, but he could perform a job where he could sit, and change positions if the job was not full-time. Chores typically done at home include "a little cooking," occasional sweeping, and shopping. He and his wife regularly attend church. He enjoys fishing and attending his son's football games, but spends much of the day lying on the couch.

He experiences constant numbness in his left calf and foot and drops things with his left

hand. He cries approximately 4 times per month, has had suicidal thoughts and considers himself a "burden" for his wife. He has trouble concentrating. (Tr., Pgs. 556-579 and 591-603).

## THE MEDICAL EXPERT

Dr. Hutson testified that Plaintiff had an MRI on August 13, 2003 and that it showed evidence of degenerative disk disease with a herniation at L4-5. Surgery was performed on August 24, 2004 by Dr. Steven Pledger, who did a disk decompression and fusion with cages and pedicle screws. Then Dr. Pledger saw Plaintiff on February 2, 2005. Plaintiff complained at that time of low back pain and pain on the outside of his right foot. He had a normal gait, reflexes and strength, but decreased range of motion in the lumbar spine and decreased sensation in the lateral right foot and exhibited negative straight leg raising. X-rays showed that "internal fixation was fine." Dr. Pledger referred Plaintiff to a neurologist, Subodh Wadhwa, M.D., who found "some degeneration of the cervical spine at C6-7, with protrusion of the disk, but no radiation. Dr. Wadhwa found normal strength and sensation, but "much pain behavior" and a "painful gait." Plaintiff was referred to Lisa Lichota, D.O., a specialist in pain management.

Dr. Lichota recorded in October, 2004 that Plaintiff rated his low back pain as a "9" and was using a cane although there was no atrophy. His grip strength and sensation were normal, but he had decreased lumbar extension and greatly decreased flexion. In May, 2005, Plaintiff reported having lost 15 lbs, feeling better and that "medications were working." In June, 2006, Plaintiff had urinary drug screen that was positive for cocaine.

Dr. Hutson concluded that Plaintiff had a vertebragenic disorder with PARS defects and spondylolesthesis in the lumbar spine as well as degenerative disc disease in the cervical spine. Dr. Hutson disagreed with the residual functional capacity assessment performed by Dr. Pledger and pointed out that the degree of lumbar flexion and extension and lateral bending Plaintiff exhibited was "very close to the normal ranges of motion." Dr. Hutson concluded that Plaintiff did not meet Listing 1.04 because he lacked the "appropriate loss of neurological function." Dr. Hutson's opinion was that Plaintiff could lift 10 lbs. occasionally and 5 lbs. frequently and sit for 6 hours in a workday. He would require a sit/stand option. He could stand and walk for 2 hours in a workday, but should not lift above shoulder level.. He should not climb ladders, ropes or scaffolds, but could perform

3

other postural movements on an occasional basis. He should avoid concentrated exposure to cold, heat, humidity, vibration, heights and hazardous areas. (Tr., Pgs. 604-610.

## THE VOCATIONAL EXPERT AND THE HYPOTHETICAL QUESTION

The first hypothetical asked the VE to assume Plaintiff could perform sedentary work and should avoid ropes, ladders and scaffolds, any work above shoulder level and any job where he would be exposed to temperature extremes or extreme humidity, dangerous machinery or unprotected heights. A additional restriction would be to avoid concentration on any task for more than 15 minutes and avoid all postural movements on more than an occasional basis.

The VE responded that there would be a representative number of sedentary and unskilled jobs in the national economy that Plaintiff could perform.

The second hypothetical added to all the previous restrictions that Plaintiff be given a sit/stand option. The VE responded that the added limitation would not erode the representative number of jobs previously discussed. A third hypothetical injected a limitation to low stress jobs; the VE responded that an erosion of 5,000 jobs would occur. A fourth hypothetical added one limitation to the second hypothetical, that Plaintiff lift no more than 10 lbs. occasionally and 5 lbs. frequently. Again, the VE testified that there would be no erosion of numbers. A fifth hypothetical added to all the restrictions contained in the third, that Plaintiff could twist at the waist no more than on occasion. The VE responded that there would be a 4,000 reduction in the number of available jobs. The sixth hypothetical added that there be no exposure to vibrations. The VE responded by testifying that there would be no further erosion.

The seventh hypothetical was asked by Plaintiff's counsel, who inquired of the VE whether there would be a representative number of jobs if Dr. Pledger's residual functional capacity assessment was accepted. The VE responded in the negative.

## THE DECISION OF THE ADMINISTRATIVE LAW JUDGE

The ALJ found that Plaintiff has three impairments: (1) chronic low back pain attributed to a vertebrogenic disorder of the lumbar spine with residuals from a fusion surgery, (2) chronic neck pain, and (3) a history of depression, anxiety and a pain disorder. The ALJ found all of these

4

impairments to be severe. The ALJ found that no impairment meets or equals any Listing. The ALJ further found that Plaintiff has the residual functional capacity to perform a limited range of sedentary work as described in the sixth hypothetical question to the VE. Accordingly, the ALJ found Plaintiff to be not disabled.

## MEDICAL RECORD

Plaintiff was seen in July, 2003 at Middletown Regional Hospital in the emergency room for radicular low back pain. He was "neurologically intact." He was prescribed Motrin, Flexeril and Vicodin. (Tr., Pgs. 165-172). The gravel lifting incident occurred 3-4 days previous.

An MRI of the lumbar spine in August, 2003 showed "central and left paracentral posterior disc herniation at the L4-5 level compressing the left L5 nerve root. . . There is a grade one anterolisthesis of L5 on S1 . . . with bilateral pars defects noted and severe bilateral foraminal stenosis and compression of the L5 nerve roots." (Tr., Pg. 173). X-rays of the lumbar spine in October, 2003 show "spondylolisthesis of L5 over S1 with no apparent spondylolysis or arthritic changes." (Tr., Pgs. 184-185).

Physical therapist Stephen Woodward reported to Arthur Arand, M.D. in October, 2003 that despite difficulty maintaining a regular therapeutic program, Plaintiff "achieved all his short term goals except for standing tolerance and some long-term goals. He requested an extension for 2-4 weeks on a twice per week basis. (Tr., Pgs. 187-196).

Reports from Mid-Valley Neurosurgery, Inc., which employs Arthur Arand, M.D., indicate that Plaintiff began to suffer low back pain after an incident, 5-months previous, where he was trying to lift a trash can containing gravel. An MRI in August, 2003 showed a "disc herniation at L4-5 compressing the left L5 nerve root, Grade I anterolisthesis of L5 on S1 with severe bilateral stenosis and compression of L5 nerve roots." Epidural steroidal injections were recommended and if radicular symptoms persist, surgery should be considered. (Tr., Pgs. 197-202).

A Physical Residual Functional Capacity Assessment was completed by Cindi Lynn Hill, M.D. a file reviewer, in June, 2004. Dr. Hill's opinion was that Plaintiff could lift 50 lbs. occasionally and 25 lbs. frequently, stand/walk for 6 hours and sit for about 6 hours in a workday. He could frequently climb ramps and stairs, balance, kneel and crawl and occasionally climb ladders,

5

ropes and scaffolds, stoop and crouch. Dr. Hill's diagnosis was "spondylolisthesis at L5-S1, retrolisthesis at L4-5 and degenerative disc disease at L5-S1." (Tr., Pgs. 203-209).

Stephen Pledger, M.D. performed surgery in August, 2004 at Middletown regional Hospital. The operative procedures were described as "Gill procedure at L5, posterior lumbar interbody fusion at L5-S1 with Peak cages and anterior column fusion, posterior lateral fusion at L4 to S1 and pedicle screw fixation at L4-L5 and S1." (Tr., Pgs. 210-220). Dr. Pledger reported in late August, 2004 that after surgery, Plaintiff developed severe pain in his back and right leg and had to be readmitted to the hospital. IV Delaudid and a pain patch seemed to resolve the pain. Dr. Wadhwa prescribed Neurontin and Pamelor. (Tr., Pgs. 221-227).

An MRI was done in late August, 2004. The results showed the presence of "a small fluid collection posterior to the L5 vertebral body [which] likely represents a postoperative seroma [and] results in some narrowing of the ventral spinal canal at L5-S1." (Tr., Pgs. 228-229).

A Disability Assessment Report was completed in September, 2004 by James Rosenthal, Psy. D., a clinical psychologist, who examined plaintiff one time at the request of the Agency. Dr. Rosenthal's opinion was that Plaintiff's ability to understand, remember and follow simple instructions and his ability to relate to bosses, co-workers and the general public were not impaired, but his ability to sustain attention and concentration was moderately impaired. "It does not appear that the Claimant could tolerate the stress of day-to-day employment due to his pain disorder with depression." A GAF of 51 was assigned. (Tr., Pgs. 231-235).

A Psychiatric Review Technique Form was completed in November, 2004 by David Dietz, Ph.D., also a clinical psychologist. Dr. Dietz's opinion was rendered based a review of the medical file. He did not examine plaintiff. Dr. Dietz diagnosed Plaintiff with a Depressive Syndrome, characterized by appetite and sleep disturbance as well as decreased energy and feelings of worthlessness. Dr. Dietz agreed with Dr. Rosenthal that Plaintiff's difficulty maintaining concentration, persistence or pace was moderately impaired, agreed that Plaintiff could handle simple repetitive tasks, but disagreed that Plaintiff has markedly impaired difficulty relative to his ability to handle stress. Dr. Dietz rated Plaintiff's difficulty handling stress as moderately impaired. (Tr., Pgs. 236-253).

In February, 2005, Plaintiff saw Dr. Dennis Anthony, an internist and primary care physician,

6

for pain in the low back, buttocks and legs. Dr. Anthony noted that Plaintiff got out of the chair normally and had a normal posture and gait. "There is no tenderness to palpation over the spinous process, paraspinal muscles, greater trochanter, sacroiliac joint or sciatic notch. There is no muscle spasm." Muscle strength in the legs was normal and sensation was normal except in the right lateral foot. X-rays showed well-placed cages. Physical therapy was continued. (Tr., Pgs. 255-256 and 262-263). Plaintiff also complained to Dr. Pledger in February, 2005 that he was suffering from pain and stiffness in his neck, shoulder and arms. X-rays showed "some spondylolisthesis at C3-4." A Medrol pack and Voltaren were prescribed for what Dr. Pledger called a "herniated nucleus pulposis at C6-7." (Tr., Pgs. 259-260). In March, 2005, Plaintiff reported worsening pain in his back and legs and was referred to Dr. Wadhwa, a neurologist. (Tr., Pgs 265-266).

A note from the physical therapist at Sport and Spine indicated that Plaintiff had been there only 5 times in 7 weeks. There may have been some sort of administrative mix-up for which Plaintiff was not responsible. In any event, Dr. Pledger wrote a prescription for another provider, Physiotherapy, and a therapist by the name of Tressa. (Tr., Pg. 269). Another report of severe pain was communicated to Dr. Pledger in October, 2005. An EMG study of both legs was ordered. (Tr., Pgs. 271-272). In November, 2004, Plaintiff again complained of severe pain in his low back, buttocks and legs. Physical therapy was again recommended. (Tr., Pgs. 278-279). In October, 2004, a drug screen showed marijuana and Dr. Pledger refused to refill Plaintiff's prescription for Percocet. (Tr., Pg. 280). A progress note in January, 2005 showed that Plaintiff again complained of pain, numbness and stiffness in his low back. Physical therapy was recommended. Duragesic, Percocet and Neurontin were continued. (Tr., Pg. 283). In September, 2004, there was an incident in Dr. Pledger's office where Plaintiff became confrontational after Dr. Pledger refused to change Plaintiff's pain medication (Tr., Pgs. 284-286).

Dr. Pledger reported in September, 2004 that Plaintiff was readmitted to the hospital for a second time following surgery. Plaintiff was on a walker and dragging his legs. His pain subsided after IV fluids, including Dilaudid, were started. Plaintiff wanted Dilaudid for home use. Dr. Pledger refused and a heated discussion ensued. (Tr., Pgs. 286-287).

From May to August, 2004, Plaintiff again reported severe pain to Dr. Pledger, who increased the dosage of Medrol and Neurontin and added MS Contin, which resulted in headaches. Lortab and

Vicodin were tried as well as Darvocet. Nothing seemed to work. (Tr., Pgs. 288-337). A bone scan was ordered.

A Physical Residual Functional Capacity Assessment was completed in February, 2005 by Edmund Gardner, M.D. Dr. Gardner's opinion, based on his review of the file, was that Plaintiff could lift 20 lbs. occasionally and 10 lbs. frequently, stand/walk for 6 hours in a workday and sit for about 6 hours. He could perform all the postural functions on an occasional basis. The basis for Dr. Gardner's opinion was that Plaintiff has degenerative disc disease of the lumbosacral spine and that it was surgically treated by laminectomy and fusion in August, 2004. Low back pain and weakness have continued since the surgery, but Plaintiff is able to walk with a normal gait without aids and has no current radiculopathy. He does have some decreased sensation in the right lateral calf and foot. His fusion is not yet stable. (Tr., Pgs. 343-350).

Dr. Pledger referred Plaintiff to Subodh Wadhwa, M.D., a neurologist in April, 2005. Dr. Wadhwa reported that Plaintiff's surgery followed intractable pain and lumbar radiculopathy. Plaintiff had a lumbar fusion and required "large amounts of narcotics, lots of pain medications and pain modulators" for relief. Plaintiff had a 10 year history of chronic back pain and reported that surgery "did not provide any lasting relief." Plaintiff takes Methadone for pain relief and is being treated by a pain management specialist. Dr. Wadhwa also mentioned that Plaintiff has a C6-7 disc protrusion with no radicular pain. His neurological examination showed normal strength and sensation, but he exhibited "marked pain behavior" and an "antalgic gait." Dr. Wadhwa's diagnosis was "chronic pain syndrome, failed back syndrome and cervical disc protrusion with myelopathy." Because Plaintiff was seeing a pain specialist and on a moderately high dose of narcotics, Dr. Wadhwa could offer no suggestions for his continuing care. (Tr., Pgs. 351-352).

Physical therapist, Stephen Woodward, reported to Dr. Pledger in June, 2005 that Plaintiff had completed 5 therapy sessions with minimal changes in his symptoms. Mr. Woodward recommended continued physical therapy at 2-3 times per week for 2-4 weeks. (Tr., Pgs. 362-365). In September, 2004, physical therapist Woodward reported to Dr. Pledger that Plaintiff had declined Cortisone injections prior to surgery. The pain was relieved after surgery until the IV medications were stopped, at which time the pain reappeared. Plaintiff's responses to a back pain questionnaire put him in the category of either bed bound or exaggerating. The plan for physical therapy was

8

strengthening and stretching. (Tr., Pgs. 384-388). In October, 2004, Plaintiff reported to physical therapist Woodward that he rated his level of improvement as 25-30%. Plaintiff also reported to Woodward that he has resorted to "black market drugs to help control his pain." Woodward's sense of smell led him to believe that the "black market drug" was marijuana. (Tr., Pg. 388).

In October, 2003, therapist Woodward reported to Arthur Arand, M.D. that Plaintiff rated his improvement at 65-70%. (Tr., Pg. 392-394

Plaintiff and his wife, Lori, attended counseling sessions at Comprehensive Counseling Service directed to helping them with listening, confrontation and problem solving issues Plaintiff reported being depressed over his inability to pay bills and his chronic back pain. Plaintiff is now on Methadone and was formerly on Morphine. (Tr., Pgs. 395-422). These sessions lasted for approximately 6 months.

Plaintiff consulted Pain Evaluation & Management Center of Ohio, Inc. and was referred to Lisa Lichota, D.O. His symptoms included muscle swelling, spasm and weakness, anxiety and depression. He exhibited cervical and lumbar tenderness and a limited range of motion in both areas. In April, 2006, Plaintiff was reported to be "doing well" and that the "pain meds were working."

Plaintiff saw Lisa Lichota, D.O. on multiple occasions from October, 2004 to February, 2006 for pain evaluation and management, although he was a reported "no show" for numerous appointments for an MRI. The diagnosis was "post-laminectomy syndrome of the lumbar region, lumbar radiculopathy and depressive disorder." Symptoms were muscle aches, spasm, swelling and weakness as well as loss of sensation, anxiety and depression. The treatments consisted of medications, such as Valium, Paxil and Methadone, low impact exercise and stretching. Both physical and psychological functioning were reported to be improved at the conclusion of treatments. (Tr., Pgs. 435-478).

Dr. Lichota reported in October, 2004 that Plaintiff sustained the injury from which he suffers, in August, 2003, when he was lifting gravel. Plaintiff has experienced back pain for 10 years, but severe back pain since the injury. His primary complaint is constant pain in his lower back, buttock, leg and feet, but he also experiences numbness and tingling in his left hand, right leg and right foot. Plaintiff reported an inability to sit for more than 15 minutes, stand for more than 5 minutes and walk for more than 10 minutes. Back surgery was in August, 2004 and post-operative

care included aquatic therapy on a 3- days- per- week basis. Plaintiff limps on his right leg and uses a cane. "Visual pain assessment is 7-8. The patient is very thin and acutely uncomfortable, changing position frequently. He gives verbal expressions of pain as well as splinting, grimacing and guarding." Cervical/thoracic range of motion testing is normal as is muscle tone and sensation in the upper extremities. There is tenderness, decreased extension and greatly decreased flexion of the lumbar spine, although muscle tone and sensation in the lower extremities was normal. The diagnosis or "impression" expressed by Dr. Lichota is "lumbar radiculopathy, status post lumbar laminectomy." At the time, "pain is simply not very well controlled yet." (Tr., Pgs. 479-482).

Dennis Anthony, M.D., an internist and Plaintiff's primary care physician, evaluated Plaintiff in October, 2006. Dr. Anthony indicated that Plaintiff had an abnormal gait, tenderness, sensory loss and impaired sleep. He opined that Plaintiff's pain would frequently interfere with his ability to attend and concentrate. Plaintiff could walk for 10 blocks, sit for 15 minutes at a time and stand for 5 minutes at a time. He could sit for less than 2 hours in a workday and stand/walk for the same amount of time. Plaintiff will need to take unscheduled breaks every 30 minutes, He should never lift more than 10 lbs, squat or climb ladders. He could occasionally stoop and climb stairs. He would miss more than 4 days per month. (Tr., Pgs. 484-487).

A similar evaluation by Dr. Pledger was completed in October, 2005. Dr. Pledger reported that he treated Plaintiff from May, 2004 to August, 2005. The diagnosis was spondylolesthesis at L-5, S1. The prognosis was poor. Dr. Pledger reported that Plaintiff suffered from muscle weakness, sensory loss, reduced range of motion and reflex changes. Dr. Pledger opined that Plaintiff could walk 1-2 blocks, sit for 10 minutes at a time and stand/walk for 5-10 minutes at a time. Plaintiff could neither sit nor walk for more than 2 hours in a workday. He would need unscheduled breaks for 5-10 minutes every 1-2 hours on the job. He could occasionally lift 10 lbs., rarely lift 20 lbs. and never lift 50 lbs. He could occasionally stoop, crouch and climb stairs, but rarely twist or climb ladders. He would miss more than 4 days per month because of his impairments or treatment. (Tr., Pgs. 489-493).

Dr. Anthony treated Plaintiff from August, 2004 to January, 2008, primarily with medications, such as Soma, Flexeril, Paxil, Methadone and Gabitril. Plaintiff's complaints of pain were in the low back, buttocks, the back side of the left leg and foot, left hand, right shoulder, across

10

the upper back and down the right thigh. In November, 2006, Dr. Anthony opined that Plaintiff could lift 10 lbs. on occasion and 5 lbs. frequently. His ability to push/pull was "moderately limited," while his ability to bend was "extremely limited." (Tr., Pgs. 494-549).

## APPLICABLE LAW

The following principles of law control resolution of the issues raised in this case. Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). The Court's sole function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision. The Commissioner's findings stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

To qualify for disability insurance benefits, plaintiff must meet certain insured status requirements, be under age 65, file an application for such benefits, and be under a disability as defined by the Social Security Act. 42 U.S.C. §§ 416(i), 423. Establishment of a disability is contingent upon two findings. First, plaintiff must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Second, the impairments must render plaintiff unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2).

To qualify for SSI benefits, plaintiff must likewise file an application and be an "eligible individual" as defined in the Act. 42 U.S.C. § 1382(a); 20 C.F.R. § 416.202. Eligibility is dependent upon disability, income, and other financial resources. 20 C.F.R. § 416.202. To establish disability, plaintiff must demonstrate a medically determinable physical or mental impairment that can be expected to last for a continuous period of not less than twelve months. Plaintiff must also show that the impairment precludes performance of the work previously done, or any other kind of substantial gainful employment that exists in the national economy. 20 C.F.R. § 416.905.

11

Regulations promulgated by the Commissioner establish a sequential evaluation process for disability determinations. 20 C.F.R. § 404.1520. First, the Commissioner determines whether the individual is currently engaging in substantial gainful activity; if so, a finding of nondisability is made and the inquiry ends. Second, if the individual is not currently engaged in substantial gainful activity, the Commissioner must determine whether the individual has a severe impairment or combination of impairments; if not, then a finding of nondisability is made and the inquiry ends. Third, if the individual has a severe impairment, the Commissioner must compare it to those in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. If the impairment meets or equals any within the Listing, disability is presumed and benefits are awarded. 20 C.F.R. § 404.1520(d). Fourth, if the individual's impairments do not meet or equal those in the Listing, the Commissioner must determine whether the impairments prevent the performance of the individual's regular previous employment. If the individual is unable to perform the relevant past work, then a prima facie case of disability is established and the burden of going forward with the evidence shifts to the Commissioner to show that there is work in the national economy which the individual can perform. *Lashley v. Secretary of H.H.S.*, 708 F.2d 1048 (6th Cir. 1983); *Kirk v. Secretary of H.H.S.*, 667 F.2d 524 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983).

Plaintiff has the burden of establishing disability by a preponderance of the evidence. *Born v. Secretary of Health and Human Servs.*, 923 F.2d 1168, 1173 (6th Cir. 1990); *Bloch v. Richardson*, 438 F.2d 1181 (6th Cir. 1971). Once plaintiff establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that plaintiff can perform other substantial gainful employment and that such employment exists in the national economy. *Harmon v. Apfel*, 168 F.3d 289, 291 (6th Cir. 1999); *Born*, 923 F.2d at 1173; *Allen v. Califano*, 613 F.2d 139 (6th Cir. 1980). To rebut a prima facie case, the Commissioner must come forward with particularized proof of plaintiff's individual capacity to perform alternate work considering plaintiff's age, education, and background, as well as the job requirements. *O'Banner v. Secretary of H.E.W.*, 587 F.2d 321, 323 (6th Cir. 1978). *See also Richardson v. Secretary of Health & Human Services*, 735 F.2d 962, 964 (6th Cir. 1984)(per curiam). Alternatively, in certain instances the Commissioner is entitled to rely on the medical-vocational guidelines (the "grid") to rebut plaintiff's prima facie case of disability. 20 C.F.R. Subpart P, Appendix 2; *O'Banner*, 587 F.2d

at 323. *See also Cole v. Secretary of Health and Human Services*, 820 F.2d 768, 771 (6th Cir. 1987).

The Commissioner must make more than a generalized finding that work is available in the national economy; there must be "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform *specific* jobs." *Richardson v. Secretary of H.H.S.*, 735 F.2d 962, 964 (6th Cir. 1984) (per curiam) (emphasis in original); *O'Banner v. Secretary of H.E.W.*, 587 F.2d 321, 323 (6th Cir. 1978). Taking notice of job availability and requirements is disfavored. *Kirk v. Secretary of H.H.S.*, 667 F.2d 524, 536-37 n.7, 540 n.9 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). There must be more than mere intuition or conjecture by the ALJ that the claimant can perform specific jobs in the national economy. *Richardson*, 735 F.2d at 964; *Kirk*, 667 F.2d at 536-37 n.7. The Commissioner is not permitted to equate the existence of certain work with plaintiff's capacity for such work on the basis of the Commissioner's own opinion. This crucial gap is bridged only through specific proof of plaintiff's individual capacity, as well as proof of the requirements of the relevant jobs. *Phillips v. Harris*, 488 F. Supp. 1161 (W.D. Va. 1980)(citing *Tayor v. Weinberger*, 512 F.2d 664 (4th Cir. 1975)). When the grid is inapplicable, the testimony of a vocational expert is required to show the availability of jobs that plaintiff can perform. *Born v. Secretary of H.H.S.*, 923 F.2d 1168, 1174 (6th Cir. 1990); *Varley v. Secretary of H.H.S.*, 820 F.2d 777, 779 (6th Cir. 1987).

The assumptions contained in an ALJ's hypothetical question to a vocational expert must be supported by some evidence in the record. *Hardaway v. Secretary of H.H.S.*, 823 F.2d 922, 927-28 (6th Cir. 1987). A proper hypothetical question should accurately describe plaintiff "in all significant, relevant respects; for a response to a hypothetical question to constitute substantial evidence, each element of the hypothetical must accurately describe the claimant." *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994). *See also Varley v. Secretary of H.H.S.*, 820 F.2d 777, 779 (6th Cir. 1987). Where the evidence supports plaintiff's allegations of pain, a response to a hypothetical question that omits any consideration of plaintiff's pain and its effects is of "little if any evidentiary value." *Noe v. Weinberger*, 512 F.2d 588, 596 (6th Cir. 1975). However, "the ALJ is not obliged to incorporate unsubstantiated complaints into his hypotheticals." *Stanley v. Secretary of H.H.S.*, 39 F.3d 115, 118 (6th Cir. 1994).

Pain alone, if the result of a medical impairment, may be severe enough to constitute

13

disability. *Kirk v. Secretary of H.H.S.*, 667 F.2d 524, 538 (6th Cir. 1981), *cert. denied,* 461 U.S. 957 (1983). In order to find plaintiff disabled on the basis of pain alone, the Commissioner must first determine whether there is objective medical evidence of an underlying medical condition. If there is, the Commissioner must then determine: (1) whether the objective medical evidence confirms the severity of pain alleged by plaintiff; or (2) whether the underlying medical impairment is severe enough that it can reasonably be expected to produce the allegedly disabling pain. *Duncan v. Secretary of H.H.S.*, 801 F.2d 847, 852-53 (6th Cir. 1986). *See also Felisky v. Bowen*, 35 F.3d 1027, 1038-39 (6th Cir. 1994); *Jones v. Secretary of H.H.S.*, 945 F.2d 1365, 1369 (6th Cir. 1991). This test, however, "does not require . . . 'objective evidence of the pain itself.'" *Duncan*, 801 F.2d at 853. Where a complaint of pain is not fully supported by objective medical findings, the Commissioner should consider the frequency and duration of pain, as well as other precipitating factors including the effect of the pain upon plaintiff's activities, the effect of plaintiff's medications and other treatments for pain, and the recorded observations of pain by plaintiff's physicians. *Felisky*, 35 F.3d at 1039-40.

Where the medical evidence is consistent, and supports plaintiff's complaints of the existence and severity of pain, the ALJ may not discredit plaintiff's testimony and deny benefits. *King v. Heckler*, 742 F.2d 968, 975 (6th Cir. 1984). Where, however, the medical evidence conflicts, and there is substantial evidence supporting and opposing a finding of disability, the Commissioner's resolution of the conflict will not be disturbed by the Court. *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983) (per curiam). In either event, the ALJ must articulate, on the record, his evaluation of the evidence and how it relates to the factors listed above. *Felisky*, 35 F.3d at 1039-41.

In light of the Commissioner's opportunity to observe the individual's demeanor, the Commissioner's credibility finding is entitled to deference and should not be discarded lightly. *Kirk*, 667 F.2d at 538. "If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reasons for doing so." *Felisky,* 35 F.3d at 1036. The ALJ's articulation of reasons for crediting or rejecting a claimant's testimony must be explicit and "is absolutely essential for meaningful appellate review." *Hurst v. Sec. of H.H.S.*, 753 F.2d 517, 519 (6th Cir. 1985)(citing *Zblewski v. Schweiker*, 732 F.2d 75, 78 (7th Cir. 1984)).

"In general, the opinions of treating physicians are accorded greater weight than those of

physicians who examine claimants only once." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 530-31 (6th Cir. 1997). Likewise, a treating physician's opinion is entitled to weight substantially greater than that of a non-examining medical advisor. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Lashley v. Secretary of H.H.S.*, 708 F.2d 1048, 1054 (6th Cir. 1983). The weight given a treating physician's opinion on the nature and severity of impairments depends on whether it is supported by sufficient medical data and is consistent with other evidence in the record. 20 C.F.R. § 404.1527(d); *Harris v. Heckler*, 756 F.2d 431 (6th Cir. 1985). If a treating physician's "opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case," the opinion is entitled to controlling weight. 20 C.F.R. § 1527(d)(2); *see also Walters*, 127 F.3d at 530. If not contradicted by any substantial evidence, a treating physician's medical opinions and diagnoses are afforded complete deference. *Harris*, 756 F.2d at 435. *See also Cohen v. Secretary of H.H.S.*, 964 F.2d 524, 528 (6th Cir. 1992). The opinion of a non-examining physician is entitled to little weight if it is contrary to the opinion of the claimant's treating physicians. *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987). If the ALJ rejects a treating physician's opinion, the ALJ's decision must be supported by a sufficient basis which is set forth in his decision. *Walter v. Commissioner*, 127 F.3d 525, 529 (6th Cir. 1997); *Shelman*, 821 F.2d at 321.

## OPINION

The second Statement of Error is that the ALJ failed to follow the "treating physician rule," C.F.R., Section 404.1527(d), and afforded undue weight to the opinion of the medical expert, Dr. Hutson. The treating physicians, to whom Plaintiff refers, are Dennis Anthony, M.D., an internist and Plaintiff's primary care physician, and Stephen Pledger, M.D., an orthopaedic surgeon. Dr. Anthony treated Plaintiff for approximately 3 1/2 years, although, as the ALJ pointed out, there was a hiatus from August, 2004 to September, 2006. Dr. Anthony is a generalist; on the other hand, Dr. Hutson is a specialist and Plaintiff's problem is orthopaedic and within the specialty of Dr. Hutson. Dr. Hutson's assessment was that Plaintiff could stand/walk for 2 hours in a workday, sit for 6 hours, lift 5 lbs. frequently and 10 lbs. occasionally. Dr. Anthony opined that Plaintiff could neither sit nor

walk for more than 2 hours in a workday and never lift more than 10 lbs. The two physicians basically disagreed on the amount of time Plaintiff would be able to sit. Dr. Hutson's argument in support of a less extreme assessment was based on his conclusion that Plaintiff's neurological deficits were minimal and that his ability to flex and extend his lumbar spine was close to normal.

Dr. Hutson's view was supported by the opinion of Dr. Wadhwa, a neurologist, whose neurological examination in April, 2005, approximately 8 months after Plaintiff's low back surgery, showed normal strength and sensation as well as Dr. Anthony's observation in February, 2005 that Plaintiff had a normal posture and gait. Dr. Hutson's view also finds support in the opinion of Dr. Gardner, who opined in February, 2005 that Plaintiff had the capacity to sit for 6 hours in a workday. Dr. Hill reached the same opinion in June, 2004.

Dr. Pledger, the orthopaedic surgeon who performed the laminectomy in August, 2004, treated Plaintiff for about 15 months, and referred Plaintiff to Dr. Wadhwa, concluded, as did Dr. Anthony, that Plaintiff lacked the capacity to sit for more than 2 hours in a workday. Dr. Pledger examined Plaintiff 6 months after surgery and found that he had a normal gait, reflexes and strength, decreased range of motion in the lumbar spine and decreased sensation in the right lateral foot. The severe limitation on sitting to 2 hours in a workday was simply unexplained and inconsistent with Plaintiff's testimony that he is "doing much better."

The ALJ is under no obligation to follow the "treating physician rule" if the opinions expressed by treating sources are not in the mainstream of medical proof. In this case, x-rays showed that the internal fixation of the pedicle screws was fine and that Plaintiff sustained some, but not a significant amount of nerve damage. The evidence supports a finding that Plaintiff did suffer a significant injury as a result of his gravel-lifting incident in August, 2003 and did have some degree of degenerative disc disease before then, and the evidence further shows that Plaintiff is in some degree of constant pain. He cooperated with physical therapists to some degree, but rejected steroidal injections, which may have helped, because of his fear of needles. He has exhibited what is known as "pain behaviors" and aggressively pursued his doctors for prescriptions of Dilaudid and Percocet. He also admitted to the use of "black market drugs" to control pain. The substances to which he was referring were cocaine and marijuana. When Dr. Pledger was asked if his patient was a malingerer, he didn't give a definitive answer.

16

The net result of this analysis is that Plaintiff has credibility issues that call into question his subjective reports of pain, which is reported to be greater than to be expected from the objective evidence in the case. There is unanimous agreement about the nature of Plaintiff's impairment, but a dispute about the functional limitations which result from it. Because of the conflict between treating sources and paper reviewers, a medical expert with a specialty in orthopaedic problems was consulted. Dr. Hutson was the tie-breaker. The ALJ's reliance upon his residual functional assessment was not erroneous, especially so because his opinion was more mainstream than either of the treating sources. His conclusions and the ALJ's reliance thereon are supported by substantial evidence.

The third Statement of Error faults the ALJ for his credibility evaluation of Plaintiff. A review of the ALJ's opinion indicates that he felt that the things Plaintiff was able to do, such as shopping, attending football games and fishing did not justify either an abdication of household duties to his wife or a conclusion that Plaintiff was disabled from all gainful activity. The second indication that the ALJ gave Plaintiff less than full credibility was the observation, made during the hearing that Plaintiff "did not actually exhibit and discernible signs of pain or distress. He seemed to have no difficulty sitting or rising, and he did not use an ambulatory aid." The third indication is the ALJ's observation, again made during the hearing that Plaintiff "gave the impression of exaggerating." This observation by the ALJ, coupled with Plaintiff's response to a back pain questionnaire, administered by the physical therapy department of Middletown Regional Hospital, that categorized him as either "bed bound or exaggerating" and Dr. Pledger's statement that he couldn't tell whether or not Plaintiff was a malingerer, gave the ALJ every reason to question Plaintiff's subjective reports of pain. The fourth reason is Plaintiff's conduct in Dr. Pledger's office when the doctor refused to fill a prescription for the pain medication Plaintiff wanted. The implication is that Plaintiff wanted the drug for reasons other than pain relief. The fifth is Plaintiff's lack of full cooperation with the physical therapy regime and his refusal to follow medical advice to have steroidal injections. The sixth is the simple fact that Plaintiff's subjective reports of disabling pain seemed out of proportion to an objective evaluation of his medical condition. The fact that the ALJ had doubts about Plaintiff's credibility is fully justified by the facts of this case. There was no error.

The fourth Statement of Error, referred to a "vocational error," is really a complaint about the hypothetical question posed to the vocational expert. The hypothetical question reflects the ALJ's residual functional capacity assessment. In his hypothetical, the ALJ adopted the assessment made by Dr. Hutson regarding Plaintiff's physical limitations and the assessment made by Dr. Deitz regarding Plaintiff's ability to tolerate stress. There was a dispute between Dr. Rosenthal, an examining, but non-treating, clinical psychologist, and Dr. Deitz, also a clinical psychologist, but a paper reviewer. While both acknowledged that Plaintiff would have a problem with workplace stress, Dr. Deitz explained his evaluation as follows: "His depression may moderately interfere with his ability to handle stress at the work place," but he is capable of handling simple repetitive tasks that are consistent with his physical abilities. The ALJ, in following Dr. Dietz's recommendation, limited Plaintiff to low stress jobs. While Dr. Rosenthal would disagree, there was an ample basis in the record for the ALJ's choice, which was neither irrational nor inconsistent with the totality of the evidence.

The remaining Statement of Error refers to Plaintiff's claim that he was entitled to a closed period of disability from October, 2003 through October, 2006. Pursuing this argument leads us invariably back to Plaintiff's basic thesis, which we have rejected, that the ALJ erred by rejecting the opinions of two treating physicians in favor of the view of the medical expert, Dr. Hutson. As the Social Security Administration argues, Plaintiff's surgery resulted in a successful fusion and from most indications, his back condition is stable with medications, which Plaintiff told both Dr. Lichota, Dr. Anthony and the ALJ were working.

## CONCLUSION

Because we find that substantial evidence justifies the decision reached by Administrative Law Judge, Thomas R. McNichols II, and because we find his analysis and reasoning to be both thorough and thoughtful, we recommend that the Administrative Law Judge's decision be affirmed and this case dismissed from the docket of the Court.

August 26, 2010

Timothy S. Hogan
United States Magistrate Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

BRIAN CUMMINGS,
      PLAINTIFF

CASE NO. 1:09-cv-00602
(DLOTT, C. J.)
(HOGAN, M.. J.)

VS.

COMMISSIONER OF
SOCIAL SECURITY,
      DEFENDANT

## NOTICE

    Attached hereto is the Report and Recommended Decision of the Honorable Timothy S. Hogan, United States Magistrate Judge, which was filed on 8-26-10 . Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten (10) days after being served with this Report and Recommendation. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation are based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten (10) days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985).